IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

RICHARD CORN                                                    PLAINTIFF

            v.              Civil No. 07-5047

BEKAERT CORPORATION                                             DEFENDANT

O R D E R

Now on this 15th day of May, 2008, come on for consideration the following motions:

       *    **Defendant's Motion For Summary Judgment** (document #10);

       *    plaintiff's **Motion For Partial Summary Judgment** (document #13);

       *    plaintiff's **Motion To Strike Defendant's Response To Plaintiff's Motion For Partial Summary Judgment** (document #29); and

       *    **Defendant's Motion To Bifurcate Trial** (document #37), and from said motions, and the responses thereto, the Court finds and orders as follows:

1.    Plaintiff Richard Corn ("Corn") alleges three causes of action against defendant Bekaert Corporation ("Bekaert"):  failure to pay for services rendered; racial discrimination in violation of **A.C.A. §16-123-107;** and failure to pay final wages upon termination of employment in violation of **A.C.A. §11-4-405.**

Bekaert now moves for summary judgment in its favor on all three claims, while Corn moves for partial summary judgment in his favor on his claim for unpaid final wages.

Corn also moves to strike Bekaert's response to his motion for

summary judgment, while Bekaert moves to bifurcate the compensatory and punitive damages aspects of the case.

These motions are ripe for decision.

2.   Turning first to Corn's Motion To Strike, the Court notes that the basis for the motion is Corn's assertion that a belated response is being used by Bekaert to support its request for continuance of this matter.  The Court has denied Bekaert's motion for a continuance.  It will likewise deny the Motion To Strike, and will consider the late-filed response.

3.   Summary judgment should be granted when the record, viewed in the light most favorable to the nonmoving party, and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  **Walsh v. United States**, **31 F.3d 696 (8th Cir. 1994)**.  Summary judgment is not appropriate unless all the evidence points toward one conclusion, and is susceptible of no reasonable inferences sustaining the position of the nonmoving party.  **Hardin v. Hussmann Corp.**, **45 F.3d 262 (8th Cir. 1995)**.  The burden is on the moving party to demonstrate the non-existence of a genuine factual dispute;  however, once the moving party has met that burden, the nonmoving party cannot rest on its pleadings, but must come forward with facts showing the existence of a genuine dispute.  **City of Mt. Pleasant, Iowa v. Associated Electric Co-op**, **838 F.2d 268 (8th Cir. 1988)**.

-2-

4. Pursuant to **Local Rule 56.1**, the parties have filed statements of facts which they contend are not in dispute. From those statements, the following significant undisputed facts are made to appear:

*      Bekaert operates a steel cord manufacturing plant located in Rogers, Arkansas. The Rogers facility operates on a team concept. Workers -- called "team members" -- are generally self-managed. Each team member shares responsibility and accountability for his or her team, and answers for the actions of the rest of the team.

*      Bekaert has an employee handbook, the Bekaert Rogers Management Plan ("Management Plan") which contains affirmative action provisions. It is Bekaert's stated policy "to be fair and impartial in all its relations with its Team Members . . . without regard to race . . . except where there is a bona fide occupational qualification." It is Bekaert's stated practice not to discriminate "in all personnel action including . . . discipline . . . ."

*      The Management Plan sets forth a list of behaviors which can result in termination, including "[d]ishonesty, theft, or falsification in any form" and "[f]alsification of any company document."

*      Corn worked as an operator on the night shift in Bekaert's Half Products Department ("Half Products").

-3-

* Four team members worked on the night shift in Half Products, divided between two production areas. These four employees could not necessarily see each other from the various work locations during their shift, due to the configuration of the workspace.

* Corn's work hours were from 4:30 p.m. to 5:00 a.m. He did not punch a time clock, but kept his own record of his time. Bekaert relies upon individual employees to fill out their time cards correctly, and places great emphasis on honesty.

* Dennis Robinson ("Robinson") was Corn's team leader. Robinson worked the day shift, and was seldom present during the night shift. Typically there is no team leader working the night shift in Half Products.

* In 2006, Julie Powell ("Powell") was the Maintenance Manager and the Half Products Production Manager. She supervised Robinson.

* In late summer or early fall of 2006, Corn's team members Brandon McClain ("McClain") and Paul Ainsworth ("Ainsworth"), as well as two other team members, complained to Robinson and Powell that Corn was leaving the plant during work hours for extended periods of time.

* As a result of the complaints, Powell asked Jason Bishop, who worked the night shift in a different department, to watch Corn and see if he was leaving the plant for long periods of time. Bishop later reported to Powell that Corn was away from the plant

-4-

on November 7, 2006, from at least 8:50 p.m. until 10:51 p.m.

* Bishop's report led Powell to discuss the situation with Plant Manager Debbie Wood ("Wood") and Manager of Human Resources Kathy Wiltse ("Wiltse").

* On November 15, 2006, before the start of his shift, Corn was called to a meeting with Wiltse, Powell, Robinson, and Doug Blevins ("Blevins"), a "personnel star point" or team member designated to represent the team in disciplinary matters.

* During the November 15 meeting, Wiltse showed Corn his time card for the week including November 7, 2006, and asked if it was accurate. The time card showed that Corn had worked twelve hours on the night of November 7, 2006. Corn repeatedly stated that the time card was accurate, and gave Wiltse information about the locations of his vehicle at various times during the shift.

* Corn was terminated after the November 15 meeting. Wiltse made the final decision to terminate.

* Robinson completed Corn's time card for his last work period. It did not include any time for November 15, 2006.

* Corn is a white male. Wiltse, Powell, Robinson and Blevins are also white. Bekaert eventually replaced Corn with a white employee.

* At an unemployment hearing, Corn testified that he believed he was laid off as a cost cutting measure.

* A black Bekaert employee, Rozell Wofford, had problems with being absent during his shift in 2002. He was counseled about

the matter and told that there would be "consequences" if the situation should recur.  Wiltse was not involved in, or apprised of, the Wofford matter.  Powell did not supervise Wofford and was not involved in the matter.

   *   Wofford also admitted playing video games during his shift.  He was disciplined by Powell and his team leader Mike Perkins ("Perkins").  Wofford received a Performance Improvement Process ("PIP III"), and was transferred to the day shift, losing $1.00 per hour pay differential.

   *   Jason Hurless ("Hurless"), a white former employee of Bekaert, ran into Rick McWhirt ("McWhirt"), Bekaert's President of Operations, while working out at the gym in his work uniform. Hurless was not disciplined.

   *   On January 3, 2007, Corn's attorney made demand to Wiltse for payment of four hours' wages for November 15, 2006.  The letter is attached as an exhibit and its contents are not disputed.  It will be referred to as necessary in the Court's opinion.

   5.   Corn's racial discrimination claim is asserted pursuant to **A.C.A. §16-123-107**, which provides, in relevant part, that

> [t]he right of an otherwise qualified person to be free from discrimination because of race . . . is recognized as and declared to be a civil right.  This right shall include, but not be limited to:  (1) The right to . . . hold employment without discrimination.

Under Arkansas law, Corn's case must proceed as explained in **Crockett v. Counseling Services of Eastern Arkansas, Inc.**, **85 Ark.**

App. 371, 379, 154 S.W.3d 278, 283-84 (2004):

> [W]here a plaintiff is unable to produce evidence that
> directly reflects the use of an illegitimate criterion
> in the challenged decision, the employee may proceed
> under the now-familiar three-step analytical framework
> described in McDonnell Douglas Corp. v. Green. . . .
> Under this test, the burden of persuasion never leaves
> the plaintiff, but there is a shift in the burden to come
> forward with evidence:  (1) the plaintiff must present
> a *prima facie* case consisting of four distinct elements;
> (2) the defendant must rebut the *prima facie* case by
> showing non-discriminatory reasons for the termination;
> and (3) the plaintiff must show the reasons are
> pretextual.  The four elements that are necessary to
> establish a *prima facie* case of racial discrimination
> are:  (1) that he is in the protected class; (2) that he
> met applicable job qualifications; (3) that his
> employment was terminated; and (4) that there is some
> additional showing that race was a factor in the
> termination.  The importance of the *prima facie* showing
> is that it creates the inference that the employer
> terminated the employee for an impermissible reason.

6.  Bekaert does not contend that Corn failed to meet
applicable job qualifications, and it is not disputed that he was
terminated.  Bekaert's motion focuses instead on Corn's contention
that his termination was racially motivated.

Because Corn is not a member of a protected class, his racial
discrimination claim is of the type generally described as a
"reverse discrimination." While the Arkansas Supreme Court has not
ruled on a reverse discrimination claim, it has held that "state
courts may look to federal decisions for persuasive authority when
considering claims under the Arkansas Civil Rights Act." **Crockett**,
*id.*

Under Eighth Circuit precedent, the difference between an

ordinary race discrimination claim and a reverse race discrimination claim is that, in order to establish a *prima facie* case in the latter, a plaintiff must show -- in addition to the other elements of the claim -- "that background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." **Hammer v. Ashcroft**, **383 F.3d 722, 724 (8th Cir. 2004)**.  Such a showing might be based on evidence of "something 'fishy' about the facts that raises an inference of discrimination." **Woods v. Perry**, **375 F.3d 671, 673 (8th Cir. 2004)**.

The Court has examined the evidence put forward on this issue, and finds no basis to believe that Bekaert is that unusual employer.  The evidence includes the following:

*    One employee, Hurless, testified that Robinson and John Floyd, another supervisor, both "handled" Wofford "with kid gloves."  He said that "the way a team leader spoke to me was different than the way [Wofford] was talked to . . . [Wofford] was just handled a little -- a little softer."  Hurless "assumed" this was because of Wofford's race, saying "he was the token black man on that side of the plant.  I mean, as bad as it sounds, that's the way it was, you know.  We needed a black man on that side of the plant and he was it."

This evidence is -- as Hurless categorized it --  merely an assumption on his part and cannot be regarded as an espousal of

Bekaert's views on the issue.  In addition, the Court believes that Hurless' assumption, even if it could be fairly attributable to Bekaert, does little or nothing prove the contention that Bekaert is the unusual employer who discriminates against the majority.  If the fact was that certain Bekaert employees "handled" one employee differently than another, without more than an assumption on the part of another employee that the "handling" was related to race, it cannot be fairly concluded that such was the case.

Finally, it would seem that an employer bent upon discriminating against a white majority in its workforce would have more than one "token" employee of the favored race.

*   Corn testified that Ainsworth told him that Bekaert would not fire Wofford because "he's the only minority in the plant; they're not going to fire him for anything."

This statement is, of course, hearsay.  Further, it is apparently the opinion of a co-worker -- not a supervisor. Corn admitted that no one in management ever confirmed this as a company attitude.  Thus, like the opinion of Hurless, it cannot be fairly regarded as an espousal of Bekaert's views on the issue.  In addition, even if the statement could be considered as reflecting Bekaert's attitude, it does little or nothing prove the contention that Bekaert is the unusual employer who discriminates against the majority since -- as already noted -- it would seem that an employer bent upon discriminating against a white majority in its workforce would  have more than one "token" employee of the favored

-9-

race.

&ast;&ast;&ast;&ast;&ast;&ast; Corn testified that when Wofford was hired, Brent Quillen came to a team meeting and talked about Bekaert hiring "a minority" and some employees being "a little bit redneck."  According to Corn, Quillen went on to say "you can't be out here telling racial jokes, you got to watch the N-word, we got to watch ourselves.  We have to walk on egg shells here because this is a new -- it's a new thing to the area it's a new thing for Bekaert."  Corn interpreted this as a sign that Bekaert "didn't want to get in any trouble with this new road they were taking by hiring minorities."

Corn does not suggest how this testimony could be interpreted as evidence that Bekaert wanted to favor minorities by discriminating against the majority -- and the Court perceives no basis to infer that it could be so interpreted.

&ast;&ast;&ast;&ast;&ast;&ast; Wofford testified that Robinson had remarked to him, after the only other black employee at Bekaert was fired about two months after Wofford was hired, that Wofford was "the only one left" or "the last black man standing," or words to that effect.

This evidence does not support the contention.  While the paucity of black employees in a workplace might, in some circumstances, reflect discrimination against blacks, the Court believes that such evidence can hardly be said to evidence a corporate tendency to discriminate against white employees.

&ast;&ast;&ast;&ast;&ast;&ast; All the supervisors involved in this case are white. While that fact does not mean there could be no racial

-10-

discrimination against a white employee, see **Oncale v. Sundowner Offshore Services, Inc.**, **523 U.S. 75 (1998)**, it certainly does not show any such discrimination but, rather, would seem to diminish the likelihood that such was occurring.

\*    Corn's replacement was white.  If Bekaert had terminated him out of animus toward a white majority, it would be unlikely to select another white employee to replace him.

\*    Corn testified that he assumed his termination was a cost-cutting measure by Bekaert.  This would seem to be at odds with his position with regard to reverse racial discrimination.  If the facts showed that Bekaert had replaced him with a black person at a lower cost of employment, then perhaps the positions could be reconciled.  However, as already noted, Corn's replacement was white.

\*    Corn also testified that he thought race played a part in his termination because "it made it easier for them to do.  I think by being Caucasian I didn't get the same treatment as the man who was black because they thought they could get away with it more easily than the man who was black, but that's my opinion."  His opinion was based on "the Brent Quillen training" and "the nervousness of the company as they started taking on minorities after years."

The thinking and opinions on the part of Corn do not, of course, represent Bekaert's views on the issue.  Even if his

thinking and opinions are correct, however, the exhibition of solicitous behavior toward a black employee by Bekaert would not necessarily establish or show that it had a discriminatory attitude toward its Caucasian employees.

Based on the foregoing evidence -- and the lack of any evidence more probative on the issue -- the Court finds there is no genuine issue of material fact in dispute as to whether Bekaert might be that "unusual employer who discriminates against the majority." In the absence of such an issue, Corn's reverse racial discrimination claim fails, regardless of whether his termination was fair or just. "Federal courts do not sit as 'super personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination'." **Edmund v. MidAmerican Energy Co.**, **299 F.3d 679, 686 (8th Cir. 2002)** (citation omitted).

7. The gravamen of Corn's claim for failure to pay for services rendered is that he was not paid for the time he spent changing into and out of his work uniform -- an activity that took, according to Corn, about 15 minutes twice a day.

Corn disavows any reliance on federal law in support of this claim, arguing instead that it is covered by Arkansas common law. He reasons that his work uniform promoted Bekaert's goals of professionalism and "team," and thus is "work" under the analysis

-12-

of **Moncus v. Billingsley Logging & American Insurance Co.**, **366 Ark. 383, 235 S.W.3d 877 (2006)**.  The Court is not persuaded that this criterion in the abstract is determinative.  Were promotion of the employer's goals the sole criterion for what constituted "work," Corn might well dress in his uniform at home and claim payment for his time going to and from the plant while wearing it -- yet **Moncus** notes that it is only under limited circumstances that driving to and from work constitutes "work" under Arkansas workers' compensation laws.

Corn also argues that he should be paid for changing into his uniform because "he would not have been allowed to work without wearing it."  That is hardly a basis to compensate him for putting it on and taking it off.  There are very few jobs where one is allowed to work without wearing clothes, yet no one is paid for getting dressed to come to work, or taking off his clothes when he arrives at home again.

While Corn does not assert that his claim falls under the Fair Labor Standards Act ("FLSA"), he does analogize to that Act's definition of work, and the Court finds case law under the FLSA relevant to the analysis of this issue.  In addressing the interplay of the FLSA and the Portal To Portal Act, the Eighth Circuit noted in **Barrentine v. Arkansas-Best Freight System**, **750 F.2d 47 (8th Cir. 1984),** that

> the terms "principal activity or activities," which must
> be paid for, are to be read liberally.  Any activity

-13-

which is "an integral and indispensable part of" the principal activity is compensable.  The only activities excluded from FLSA coverage are those undertaken "for [the employees'] own convenience, not being required by the employer and not being necessary for the performance of their duties for the employer."  Examples of noncompensable activities specifically enumerated in the Senate report on the Portal-to-Portal Act as being "outside the employee's workday," include "[c]hecking in and out and waiting in line to do so, **changing clothes**, washing up or showering, [and] waiting in line to receive paychecks."

**750 F.2d at 50** (internal citations omitted, emphasis added).

Donning and doffing safety gear in the workplace is clearly a compensable activity under federal law, see **29 C.F.R. §790.8**, but donning and doffing a uniform similar to ordinary street wear -- which could as well be put on or taken off in the employee's home as in the factory -- is "merely a convenience to the employee and not directly related to his principal activities." *Id.*  See also **Wage and Hour Advisory Memorandum No. 2006-2**:  "It is our longstanding position that if employees have the option and the ability to change into the required gear at home, changing into that gear is not a principal activity, even when it takes place at the plant."

Corn offers nothing that persuades the Court that there is any genuine dispute of material fact on the donning and doffing claim, and the Court finds that Bekaert is entitled to summary judgment in its favor on that claim.

8.  Corn's claim under **A.C.A. §11-4-405** is that Bekaert failed to pay him wages for the time he spent in the termination

meeting on November 15, 2006, as a consequence of which he claims both the unpaid wages and a statutory penalty.

Corn testified that the meeting at which he was terminated lasted 35 to 40 minutes.  On January 3, 2007, Corn's lawyer directed a letter to Wiltse requesting payment for four hours on November 15, 2006.  This request was denied on January 8, 2007, and Corn filed suit on February 13, 2007.

Bekaert contends that Corn did no work on November 15, and consequently is entitled to no pay, and that his "demand" for pay was deficient.  It also contends that even if Corn were entitled to pay for November 15, it acted in good faith and no penalty should be imposed; that the amount should be offset by the amount Corn was overpaid for three hours, and for two hours it alleges that he did not work; and that any such payment should stop after sixty days.

The statute in question provides that when a corporation discharges an employee, without or without cause, "the unpaid wages of the servant or employee then earned at the contract rate, without abatement or deduction, shall be and become due and payable on the day of the discharge. . . ."  If the wages are not paid within seven days, they "shall continue from the date of the discharge . . . at the same rate until paid.  However, the wages shall not continue for more than sixty (60) days unless an action therefor shall be commenced within that time."

9.   The contention that Corn should not be paid for the time in question because he did no work -- or that Robinson at least

-15-

acted in good faith in believing this -- is easily disposed of. Robinson testified that Corn was not paid for it because "I never allowed him to start his shift."  If Corn had not been terminated and had started his shift after the meeting, Robinson testified that he would have been paid for that time.  Given that Corn would have performed no "work" for Bekaert while at the meeting whether he was discharged or not, but would have been paid for that time if he had not been discharged, there is no justification -- good faith or otherwise -- for finding that he should not be paid under the other scenario.

10.  The Court next addresses whether there is a genuine dispute of material fact as to whether money is now due and owing to Corn for the time in question, or whether one of two offsets applies.

One offset urged by Bekaert is wages paid to Corn for the two hours he was allegedly away from the plant on November 7, 2006 -- referring to the situation which led to Corn's discharge.  This issue is hotly contested, and the Court finds there is a genuine dispute about whether Corn was in the plant and on the job during those two hours.

The other offset urged by Bekaert is an alleged overpayment for three hours on Corn's last paycheck.  Wiltse testified that Corn "left owing us three hours of pay."  Cindy Seamster, an Executive Human Resources Assistant, averred in an Affidavit that at the time of his termination, Corn was paid for three more hours

-16-

than he was entitled to be paid for.  Her computations were based, in part, on her theory that Corn was not entitled to time and a half pay for the last Sunday he worked, because he did not work more than forty hours that week.

Corn disputes that he was overpaid, contending that by his calculations he was underpaid for twelve hours of overtime, and points out that according to the Management Plan, "[a]ll Sunday work is paid at 1 1/2 regardless of number of hours worked."

The Court concludes that there is a genuine dispute of material fact as to whether Corn was paid enough to compensate him for the time that he spent in the termination meeting.  For this reason, summary judgment will be denied on this aspect of the claim under **A.C.A. §11-4-405.**

11.  Finally, with regard to the **A.C.A. §11-4-405** claim, the Court must determine whether there is any genuine dispute of material fact as to whether a penalty may attach.  Bekaert contends it cannot, based on alleged deficiencies in the demand for payment.

With regard to the form of the demand, the statute provides as follows:

> (2) Any servant or employee may request of his foreman or the keeper of his or her time to have the money due him or her, or a valid check therefor, sent to any station where a regular agent is kept.  If the money or a valid check therefor does not reach the station within seven (7) days from the date it is so requested, then, as a penalty for the nonpayment, the wages of the servant or employee shall continue from the date of the discharge or refusal to further employ at the same rate until paid.  However, the wages shall not continue more

-17-

> than sixty (60) days unless an action therefor shall be
> commenced within that time.
>     (b)  This section shall apply to all companies and
> corporations doing business in this state and to all
> servants and employees thereof.   Any servants or
> employees who shall hereafter be discharged or refused
> further employment may request or demand the payment of
> any wages due and, if not paid within seven (7) days
> from discharge or refusal to longer employ, then the
> penalties provided in subdivision (a)(2) of this section
> for railway employees shall attach.

As explained in **Rousseau v. Ed White Junion Shoe Co.**, **222 Ark. 240, 243, 258 S.W.2d 240, 242 (1953)**, "this law is penal in the extreme. . . . When the penalty is so obviously disproportionate to the actual injury it has always been the policy of the law to hold the plaintiff to a strict compliance with the statutory conditions."

**Rousseau** also adds the judicial gloss that brings this peculiar statute -- initially created for the protection of railroad employees -- into line with its later application to other types of corporate employees, i.e., the necessity to specifically state in the wage demand an address to which the wages are to be mailed:

> [S]ince every employer is likely to have in his files
> the address of each of his employees, the statutory
> requirement that the employee pointedly notify the
> employer of a mailing address would be completely
> nullified if the employer's prior knowledge were taken
> "by intendment" as a compliance with the law.

**222 Ark. at 243-44, 258 S.W.2d at 242.**

The demand in the case at bar is embodied in a letter sent by Corn's attorney to Wiltse on January 3, 2007.  This letter fails to

-18-

strictly comply with the statute in two respects:

   *   First, it is not addressed to Corn's foreman or the keeper of his time.  Wiltse was not Corn's "foreman" or the keeper of his time.  Foreman "refer[s] to the immediate foreman or timekeeper, and not to any superior of the discharged employee in the same department." **McCoy-Couch Furniture Mfg. Co. v. Zahringer, 208 Ark. 581, 586, 186 S.W.2d 922, 924 (1945).**  Robinson was Corn's immediate supervisor.  Bekaert employees keep their own time cards, but since Corn was not there to do this after he was discharged, Robinson filled out Corn's last time card.

   *   Second, the letter requests that the payment be sent to Corn, but does not give an address for him.  The fact that Bekaert might have had an address for Corn is irrelevant.  Corn, or his attorney, was required to state the address to which payment should be sent.

   Because of these deficiencies, the Court finds that there is no genuine dispute of material fact on the question of whether a penalty may attach, should Bekaert be found liable for unpaid wages.  Bekaert is entitled to summary judgment on this issue.

   12.  Given the foregoing rulings, there is only one issue for trial in this matter, i.e., whether Corn was paid for the time he spent at the termination meeting on November 15, 2006.  There is no reason to bifurcate this case, and the motion to do so will be denied.

**IT IS THEREFORE ORDERED** that **Defendant's Motion For Summary Judgment** (document #10) is **granted in part and denied in part.**

The motion is **denied** insofar as it seeks judgment in favor of Bekaert Corporation on Richard Corn's claim that he was not paid for time spent in the termination meeting of November 15, 2006.

The motion is **granted** in all other respects.

**IT IS FURTHER ORDERED** that plaintiff's **Motion For Partial Summary Judgment** (document #13) is **denied.**

**IT IS FURTHER ORDERED** that plaintiff's **Motion To Strike Defendant's Response To Plaintiff's Motion For Partial Summary Judgment** (document #29) is **denied.**

**IT IS FURTHER ORDERED** that **Defendant's Motion To Bifurcate Trial** (document #37) is **denied.**

**IT IS SO ORDERED.**

   /s/ Jimm Larry Hendren
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**